UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

WILLIAM WARINNER, et al.                                                                    PLAINTIFFS


v.                                                                    CIVIL ACTION NO. 3:05-CV-244-S


NORTH AMERICAN SECURITY
SOLUTIONS, INC., et al.                                                                    DEFENDANTS

## MEMORANDUM OPINION

This matter is before the court on the motion of defendants Ford Motor Company ("Ford") and

Tami Hatfield ("Hatfield"), a Ford labor relations representative, for summary judgment (DN 99).  For

the following reasons, the motion for summary judgment will be granted in part and denied in part.  In

addition to their motion for summary judgment, Ford and Hatfield have filed a motion to exceed forty

page limit for memorandum in support of motion for summary judgment (DN 94).  This motion will be

granted.  Ford and Hatfield have also filed a motion to strike Plaintiffs' surreply (DN 126).  Plaintiffs'

surreply is not authorized by Local Joint Civil Rule 7.1.  Plaintiffs failed to seek leave of this court prior

to filing their surreply and have failed to respond to the motion to strike.  The court will, therefore, grant

the motion and will strike Plaintiffs surreply from the record of this action.

## BACKGROUND

This action arises out of an undercover drug investigation which occurred at Ford's Louisville

Assembly Plant (the "Plant").[1]  Ford's drug policy prohibits employee possession, use, sale and transfer

of illegal or medically unauthorized drugs at the Plant.  In early 2003, Ford received a number of

---

[1] Three separate actions were originally filed by 21 plaintiffs based on the undercover drug investigation.  Two of the actions have been dismissed.  Of the 15 plaintiffs that initially filed the action currently before the court, only three remain, Gary Bennet ("Bennet"), Richard Tompkins ("Tompkins"), and William Warinner ("Warinner") (collectively, "Plaintiffs").

employee complaints regarding drug policy violations at the Plant.  In response, Ford contacted North American Security Solutions, Inc. ("NASS"), a security consulting and investigative firm, to begin an undercover investigation of possible violations.  NASS investigators Justin Bradbury ("Bradbury") and Carrie Weir ("Weir") (collectively, the "Investigators"), disguised as Ford employees, were placed among a class of Ford new-hires and assigned to job positions in the Plant.

Other Ford employees, including Plaintiffs, were unaware that the Investigators were investigating possible drug policy violations as undercover agents.  The Investigators associated with numerous Ford employees, often accompanying them off of Plant grounds during breaks and socializing with them after working hours.  During the course of their interaction with these employees the Investigators witnessed drug use, and were able to purchase drugs from a number of employees.  Most of these observations and transactions occurred on Plant grounds.  Some, however, took place at restaurants, bars, and convenience stores near the Plant.  The Investigators  turned over the drugs purchased from Ford employees to the Louisville Metro Police Department ("LMPD").[2]

Based on the results of NASS's investigation, Ford terminated a number of Plant employees for drug policy violations.  Plaintiffs were among those that were terminated.  Bennet and Tompkins were also criminally prosecuted for their drug activity.  Bennet pled guilty to three counts of trafficking in a controlled substance while Tompkins pled guilty to illegal possession of a controlled substance.[3]

Plaintiffs filed this action on March 21, 2005, asserting multiple claims against Ford and Hatfield including: (1) invasion of privacy by intrusion upon seclusion; (2) false light invasion of privacy; (3)

---

[2] The LMPD, as well as the Commonwealth Attorney's Office were notified of the investigation prior to its commencement at a meeting with Ford and NASS representatives.  Both the LMPD and the Commonwealth Attorney's Office approved of the investigation.

[3] Both Bennet and Tompkins pled guilty under *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

invasion of privacy by public disclosure of private facts; (4) outrage; (5) battery; (6) violations of 42 U.S.C. § 1983; (7) violations of the Fair Credit Reporting Act ("FCRA"); (8) wrongful discharge; and (9) malicious prosecution.[4]  Ford and Hatfield have now moved for summary judgment as to these claims.

## DISCUSSION

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976).  Not every factual dispute between the parties will prevent summary judgment.  The disputed facts must be material.  They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986).  The dispute must also be genuine.  The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party.  *Id.*  The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.  *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968).  The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. V. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

The court notes at the outset that in response to the motion for summary judgment filed by Ford and Hatfield, Plaintiffs have provided no evidence or argument with respect to Hatfield.  The court will, therefore, grant judgment to Hatfield and the claims asserted against her will be dismissed.  Additionally, Plaintiffs have also failed to address their claims for invasion of privacy by public disclosure of private

---

[4]Plaintiffs also asserted claims against NASS, Bradbury, Weir, and Michael Spencer, a NASS supervisor. Plaintiffs' claims against these defendants have previously been dismissed.

facts, wrongful discharge, and malicious prosecution.  Accordingly, the court will grant judgment to Ford as to these claims and such claims will be dismissed.  As to Plaintiff's remaining claims, the court need only consider Ford's arguments with respect to the merits of the claims to rule on the motion for summary judgment.[5]

**Invasion of Privacy by Intrusion Upon Seclusion**

Plaintiffs contend that Ford invaded their privacy by intruding upon their seclusion because the Investigators, as Ford's agents, investigated their activity both on and off Plant grounds.  To prevail on a claim for invasion of privacy by intrusion upon seclusion, a plaintiff must show:  (1) an intentional intrusion by the defendant; (2) into a matter which the plaintiff has a right to keep private; (3) by the use of a method which is objectionable to the reasonable person.  *Smith v. Bob Smith Chevrolet, Inc.*, 275 F.Supp.2d 808, 822 (W.D.Ky.2003) (citing Restatement (Second) of Torts § 652(B) and noting that while no Kentucky court in a published opinion has explained in any detail the elements required to meet intrusion upon seclusion, because Kentucky has adopted the Restatement version of invasion of privacy, Kentucky's highest court would likely adopt the definitions therein).

The court does not find that the investigation at issue in this case intruded into matters which Plaintiffs had a right to keep private.  Whether a plaintiff has a right to keep something private is dependent upon whether the plaintiff has a reasonable expectation of privacy in the matter.  *Webb v. Bob*

---

[5] In addition to arguing that Plaintiff's claims for invasion of privacy by intrusion upon seclusion, false light invasion of privacy, and outrage, fail on the merits, Ford asserts that these claims are preempted by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185.  Because the court finds these claims fail on the merits, the court need not consider this argument.

Ford also asserts that NASS was an independent contractor and, as such, it cannot be held liable with respect to those claims that seek to hold it vicariously liable for the actions of NASS and the Investigators.  Because the court finds those claims that seek to hold Ford vicariously liable fail on the merits, the court need not consider this argument.  The court notes, however, that the factors used by Kentucky courts to distinguish between independent contractors and employees, *see Sam Horne Motor & Implement Co. v. Gregg*, 279 S.W.2d 755, 756-57 (Ky.Ct.App. 1955), indicate that NASS and the Investigators were independent contractors.  Accordingly, Ford appears to be insulated from liability with respect to those claims that seek to hold it vicariously liable.

- 4 -

*Smith Chevrolet, Inc.,* 2005 WL 2065237, at *6 (W.D.Ky. Aug. 24, 2005) (citing *McCall v. Courier-Journal and Louisville Times Co.*, 623 S.W.2d 882, 887 (1981)). "A plaintiff in an invasion of privacy case must have conducted himself or herself in a manner consistent with an actual expectation of privacy." *Price v. General Motors Corp.*, 1:99-CV-78-R, slip op. at 19 (W.D.Ky Jan 17, 2001) (quoting *Fletcher v. Price Chopper Foods of Trumann, Inc.*, 220 F.3d 871, 875 (8th Cir. 2000)).   In this case, Plaintiffs freely engaged in drug activity with the investigators.  They "cannot now claim some kind of solitude or seclusion for [their] drug use and trafficking." *Price*, slip op. at 19 (citing *Moffett v. Gene B. Glick Co., Inc.*, 621 F.Supp. 244, 283 (N.D.Ind. 1985) (applying Restatement (Second) of Torts § 652B) (*overruled on other grounds by Reeder-Baker v. Lincoln Nat. Corp.*, 644 F.Supp.983 (N.D.Ind. 1986)). Plaintiffs make much of the fact that, when invited, the Investigators went to the homes of Plant employees.  Plaintiffs, however, fail to establish that either of the Investigators reported upon or conducted any surveillance during those times.  Rather, the record indicates that the Investigators reported solely only upon the drug activities openly engaged in by Plaintiffs at the Plant, and at public restaurants, bars, and convenience stores near the Plant.  At no time did Plaintiffs ever conduct themselves "in a manner consistent with an expectation of privacy."  *Price*, slip op. at 19 (quoting *Fletcher*, 220 F.3d at 875)).  Accordingly, the court will dismiss Plaintiffs' claims for invasion of privacy by intrusion upon seclusion.[6]

## False Light Invasion of Privacy

Plaintiffs claim that Ford invaded their privacy by placing them in a false light by reporting that they were involved in drug activity at the Plant.  To prevail on a false light invasion of privacy claim, a plaintiff must show: (1) publicity by the defendant; (2) which is unreasonable; and (3) which "attributes

---

[6]The court in *Price* was also faced with a situation where an employer hired  an investigative firm to conduct an undercover investigation into employee drug  use.  The court denied summary judgment with respect to the plaintiff's intrusion upon seclusion claims.  The differing  factual circumstances presented in this case justify a different conclusion.

to plaintiff characteristics, conduct or beliefs that are false and that he is placed before the public in a false position." *Stewart v. Pantry, Inc.*, 715 F.Supp. 1361, 1369 (W.D.Ky. 1988) (citing *McCall*, 623 S.W.2d at 888, n.9). "The essence of a false light claim is that it results in creation of a false public image of the plaintiff." *Id.*

Plaintiffs have failed to establish that Ford publicly disclosed any information about them. Bennet and Tompkins claim that their names and likenesses appeared on television as having been arrested and terminated for drug activity at the Plant. The record, however, does not indicate that their names or likenesses ever appeared in the media. Plaintiffs also assert that the reports prepared by the Investigators were publicly disclosed. Again, Plaintiffs have provided no evidence to support their assertion. Ford acknowledges that it disclosed the reports to the human resource officials who were involved with the decision to terminate Plaintiffs, as well as Plaintiffs' union representatives who were present at their termination meetings. Such disclosures, however, were privileged under Kentucky law. *See Landrum v. Braun*, 978 S.W.2d 756, 757-58 (holding that a qualified privilege exists "in matters involving communications between employees in the chain of command" and that "[i]t is necessary to have this privilege so that every day business can be carried out without the threat of suit"). Accordingly, Plaintiffs' false light invasion of privacy claims will be dismissed.

**Outrage**

Plaintiffs claim that Ford's action of hiring NASS and the Investigator's actions in soliciting drugs from them both on and off Plant grounds constitute extreme and outrageous conduct. To establish a claim for outrage under Kentucky law, a plaintiff must show: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable in that it offends against generally acceptable standards of decency and morality; (3) a causal connection between the wrongdoer's conduct and emotional distress; and (4) severe emotional distress. *Gilbert v. Barkes*, 987 S.W.2d 772, 777 (Ky.

1999).  The burden of proof is rather high in outrage cases, as the plaintiff must demonstrate "conduct which is so extreme as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *Price*, slip op. at 28 (citing *Hayes v. Bakery Confectionary and Tobacco Workers International Union of America, Local 213*, 753 F.Supp.209, 215 (W.D.Ky. 1989)).  It is not enough that the defendant's conduct be "characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Id.* (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 805 (6th Cir. 1994)).

The record in this case falls far short of establishing that Ford acted in an "outrageous" manner. Conducting an undercover investigation into possible drug policy violations simply does not amount to activity that is "atrocious and utterly intolerable" in a civilized community.  *See id.* (citing *Hayes*, 753 F.Supp. at 215) (conducting an undercover investigation into drug activity "does not amount to activity that is 'atrocious and utterly intolerable' in a civilized community").  Accordingly, the court will dismiss Plaintiffs' outrage claims.

**Battery**

Tompkins and Warinner have asserted claims for battery against Ford.  To establish a claim for battery under Kentucky law, a plaintiff must show that he was unlawfully touched by another person who intended to make contact. *Vitale v. Henchey*, 24 S.W.3d 651, 657 (Ky. 2000).  Kentucky courts follow the Restatement (Second) of Torts, *see id.*, which provides that the unlawful contact "must be one which would offend the ordinary person" and "which is unwarranted by the social usages prevalent at the time and place at which it is inflicted."   Restatement (Second) of Torts § 19 cmt. a.

Warinner's battery claim stems from his allegation that Weir rubbed her body against him at a public bar while dancing.  This allegation pertains solely to Weir and is completely unrelated to the

- 7 -

investigation.  Even if this touching were considered to be offensive, Ford could not be held liable for battery.  Accordingly, the court will dismiss Warinner's battery claim.

Tompkins claims that on the day of his termination, a Ford employee drug him by his arm through the Plant to the offices where he was then terminated.  Ford does not dispute that Tompkins was physically escorted from his workstation by a Ford employee who held onto his arm.  But Ford contends that its touching of Tompkins was not the type of contact that would offend an ordinary person working in a manufacturing environment.  Ford cites *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613 (7th Cir. 1989) in support of its argument.  In *Schroeder*, a flight attendant took the arm of a passenger who was the innocent victim of a bomb threat and led her to the cockpit.  The court held that such contact could not be considered harmful or offensive, because the passenger voluntarily went with the flight attendant, which suggested consent, and never indicated to the flight attendant that she was harmed or offended by the touching.  *Id.* at 622.  Tompkins, unlike the plaintiff in *Schroeder*, testified in his deposition that the Ford employee hurt his arm, and that he asked the Ford employee to let go of him because he wanted to call his attorney and that the employee refused.  The court cannot conclude as a matter of law upon the record before it that Ford's touching of Tompkins was not offensive.  Ford's motion for summary judgment as to Tompkins' battery claim will be denied.

### Section 1983 Claims

Plaintiffs claim that the Investigators, as Ford's agents, violated their constitutional rights during the investigation and that they acted under color of state law.  Plaintiffs, therefore, argue that Ford is liable for violation of 42 U.S.C. § 1983.

Section 1983 imposes civil liability on a person acting under color of state law who deprives another of the "rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  To state a claim arising under § 1983, a plaintiff must allege: "(1) that he was deprived of a right

secured by the Constitution or laws of the United States, and (2) that he was subjected or caused to be subjected to this deprivation by a person acting under color of state law." *Gregory v. Shelby County*, 220 F.3d 433, 441 (6th Cir. 2000). Ford contends that Plaintiffs § 1983 claims must be dismissed because they have failed to establish that it acted under color of state law.

Section 1983 does not, as a general rule, prohibit the conduct of private parties acting in their individual capacities. "As a matter of substantive constitutional law the state action requirement reflects judicial recognition of the fact that most rights secured by the Constitution are protected only against infringement by governments." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Liability under § 1983, however, is not limited to state actors. A private party can be held to constitutional standards when its actions are "fairly attributable to the state." *Romanski v. Detroit Entertainment, LLC*, 428 F.3d 629, 636 (6th Cir. 2005) (quoting *Lugar,* 457 U.S. at 937)).

In the Sixth Circuit, courts have applied three tests to determine whether the challenged conduct was taken under color of state law in order to hold defendants liable under § 1983: (1) the public function test; (2) the state compulsion test; and (3) the symbiotic relationship or nexus test. *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003) (citing *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992)).

The public function test requires that the private entity exercise powers which are traditionally exclusively reserved to the state such as holding elections, exercising eminent domain, and operating a company-owned town. *Chapman*, 319 F.3d at 833-34. This test has been interpreted narrowly. Courts have consistently held that the mere fact that the performance of private security functions may entail the investigation of a crime does not transform the individual investigating the crime into a state actor. *See id.* at 834. Accordingly, Plaintiffs cannot establish that Ford acted under color of state law under this test. *See Price,* slip op. at 9 (employer hiring private firm to conduct an undercover drug investigation is not an activity "traditionally exclusively reserved to the state").

The state compulsion test requires that the state "exercise such coercive power or provide such significant encouragement... that in law the choice of the private actor is deemed to be that of the state." *Wolotsky*, 960 F.2d at 1335. The plaintiff must demonstrate that the state offered "more than mere approval or acquiescence in the initiatives of the private party." *Id.* Nothing in the record indicates that Ford, NASS, or the Investigators were acting at the behest of, or otherwise controlled by the LMPD. LMPD did not draft an operations plan, nor did they control or determine how drug buys would be made or the amounts or price of the buys. Rather, the Investigators investigated Plaintiffs at the direction of their supervisors at NASS, and only thereafter turned the drugs over to the LMPD. The decision to arrest and prosecute Bennet and Tompkins was made solely by the LMPD and was a secondary effect of Ford's investigation into violations of its drug policy at the Plant. Accordingly, Plaintiffs cannot establish that Ford was acting under state compulsion. *See Price*, slip op. at 9-10 (turning over evidence discovered by private firm hired by employer to investigate illegal drug activity and discussing the investigation with the police does not establish that the police controlled the employer's activities).

Under the nexus test, "the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Lansing v. City of Memphis*, 202 F.3d 821, 830 (6th Cir. 2000) (quoting *Wolotsky*, 960 F.2d at 1335). "[I]t must be demonstrated that the state is intimately involved in the challenged private conduct in order for that conduct to be attributed to the state for purposes of Section 1983." *Wolotsky*, 960 F.2d at 1335. In explaining this standard, the Supreme Court has noted that, "what is fairly attributable to the state is a matter of normative judgment, and the criteria lacks simplicity... no one fact can function as a necessary condition across the board for finding state action. *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 295-96, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). Such an inquiry is a highly fact-bound, focusing on the

- 10 -

nature of the relationship between the state and private actor in light of the "framework of the peculiar facts or circumstances present." *Lansing*, 202 F.3d at 830 (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 726, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)).   "[M]ere cooperation [between a private actor and the state] does not rise to the level of merger required for finding state action."  *Lansing*, 202 F.3d at 831.

        In this case, Ford, NASS, and the LMPD had a cooperative relationship, as evidenced by their meeting prior to the commencement of the investigation.  However, this relationship does not establish that either NASS or Ford acted under color of state law.  *See id.*; *see also Price*, slip op. at 10 ("[t]he fact that the private entity and the state are involved in an ongoing relationship" coordinating evidence retrieval during an undercover drug investigation does not create a sufficiently close nexus to establish a § 1983 claim).

        Because Ford was not acting under color of state law, it may not be held liable under § 1983, and such claims must be dismissed.

**FCRA Claims**

        Plaintiffs claim that Ford violated the FCRA by investigating their behavior and preparing "consumer reports" with respect to them without their knowledge and consent.

        The FCRA requires consumer reporting agencies[7] to use reasonable procedures to guarantee maximum possible accuracy in their "consumer reports."  Under certain circumstances, it also requires that employers provide notification to employees prior to preparing or obtaining a "consumer report."  *See* 15 U.S.C. § 1681, *et seq.*  "While the majority of the cases that arise under this Act involve credit reports, 'consumer reports' and their use for employment purposes are within the purpose of the Act as

------

[7] The term "consumer reporting agency" means "any person which, for monetary fees,... regularly engages in whole or in part in the practice of assembling... information on consumers for the purpose of furnishing consumer reports to third parties.... 15 U.S.C. § 1681a(f).

articulated by Congress." *Salazar v. Golden State Warriors*, 124 F.Supp.2d 1155, 1158 (N.D.Cal. 2000). The FCRA defines a "consumer report" as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's... character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for -- employment purposes." 15 U.S.C. § 1681a(d)(1)(B).

Specifically excluded from the definition of "consumer report," however, is "any report containing information solely as to transactions or experiences between the consumer and the person making the report." 15 U.S.C. § 1681a(d)(2)(A)(i). Courts have held that surveillance reports regarding an employee's drug use compiled by a private investigator were excluded from the definition of "consumer reports," and the coverage of the FCRA, under this "transactions and experiences" exception, when the reports were based solely on the investigator's own experience with, and observations of, the employee. *See Salazar*, 124 F.Supp.2d at 1159. The record in this case indicates that the reports prepared by the Investigators were based solely on their own experiences with, and observations of, Plaintiffs. Plaintiffs, however, argue that because the Investigators employed deceit in order to interact with them that the transactions and experiences exception does not apply. The court is unpersuaded by this argument. The transactions and experiences exception does not distinguish between "honest" interaction and interaction involving an element of deceit. Rather, the exception requires only that the report was generated as a result of first-hand interaction between the reporter (the Investigators) and the consumer (Plaintiffs). *See id.* ("[t]he exception... does not require a mutual interaction [but i]nstead, it requires that the reporter have 'first-hand' knowledge of the information included in the report"). Such requirement is clearly met in this case.[8]   Accordingly, Plaintiffs' FCRA must be dismissed.

---

[8]Plaintiffs also argue that the reports prepared by the Investigators were "consumer reports" based on FTC
(continued...)

A separate order will be entered herein this date in accordance with this opinion.

---

[8](...continued)
Chariman Robert Pitofsky's letter stating that reports made by law firms and investigative firms who regularly conduct investigations of alleged workplace misconduct by employees are likely to be "consumer  reports" within the meaning of the FCRA. Letter of R. Pitofsky to Rep. Pete Sessions, Mar. 31, 2000, found at http://www. ftc.gov/os/2000/03/ltrpitofskysessions.htm.  This  statement, however, does not alter the court's conclusion that the reports in this case fall squarely within the transactions and experiences exception, and are, therefore, excluded from the definition of "consumer reports" and the coverage of the FCRA.